**IN THE UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

|  |  |
|---|---|
| | 4:24-cv-3860-JD |
| CAPITAL RESORTS GROUP, LLC d/b/a CAPITAL VACATIONS, a Delaware limited liability company; | CIVIL NO. _____ |
| Plaintiffs, | JURY DEMAND |
| vs. | |
| FONBUENA LAW FIRM, CHTD d/b/a TIMESHARE DEFENSE ATTORNEYS, a Nevada limited liability company; RICHARD FONBUENA, an individual; | |
| Defendants. | |
| _____/ | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Capital Resorts Group, LLC d/b/a Capital Vacations, a Delaware limited liability company ("Capital") files this Complaint for Injunctive Relief and Damages against Defendants Fonbuena Law Firm, CHTD, d/b/a Timeshare Defense Attorneys, a Nevada limited liability company ("TDA"); and Richard Fonbuena, an individual ("Fonbuena") (TDA and Fonbuena collectively, the "Defendants"), to address an unlawful scheme that strategically utilizes unfair and deceptive trade practices to target Capital and its customers for purposes of offering illusory "timeshare cancellation services." As described below, Defendants' unfair and deceptive trade practices are in violation of the Defendants' ethical obligations as licensed attorneys; with the overall scheme constituting an unlawful scheme, and further constituting unfair and deceptive trade practices under South Carolina and North Carolina law. Capital seeks injunctive relief and damages in connection with Defendants' misconduct. In support of its claims, on its own behalf, and in vindication of its own rights, Capital states as follows:

## INTRODUCTION

1.    Capital is headquartered in Myrtle Beach, South Carolina and markets, sells, and/or manages more than 200 premier vacation destinations throughout the world that customers can book by using Capital Points sold by Capital and its affiliates, including over a dozen resorts in South Carolina and over a dozen in North Carolina.

2.    TDA's sole purpose—and that of the other similarly situated inhabitants of the cottage industry known as timeshare cancellation—is to "cancel" enforceable timeshare contracts without proper justification.  Essentially, TDA has made a business of and monetized the tort of tortious interference with contract by targeting and disrupting valid contracts between timeshare companies, including Capital, and their customers.

3.    TDA's website, https://timesharedefenseattorneys.com, leads with the statement, "How to Get Out of Your Timeshare Contract" and advertises that "if you want to cancel your timeshare contract, don't go it alone."  TDA's call to action on its homepage invites prospective customers to "Take the 3 Simple Steps to Freedom" which are to "Book a Free Consult," "Answer a Few Questions," and "Ger Your Case Started."

4.    Whether from TDA's website, or any other number of marketing and lead generation sources, prospective customers are expecting TDA to be selling a legal-based service to cancel their timeshares.  TDA's sales pitch purports to offer services based upon an analysis of legal remedies and courses of action to cancel the prospective customer's timeshare, often along with illegal credit repair services, neither of which TDA can in fact provide.

5.    However, Defendants have no process or procedure that would permit a timeshare owner to lawfully cease payments on his or her timeshare contract. Defendants are not parties to

the timeshare contracts and have no privilege to interfere with timeshare contracts for their own pecuniary gain.

6.      At its core, Defendants' business "process" is an elaborate sales scheme designed to collect exorbitant up-front fees from timeshare owners by convincing them that Defendants have a legal-based process that will cancel their timeshare contract.

7.      Defendants' purported "service" is illusory in that Defendants simply send timeshare companies, such as Capital, form demand letters, despite knowing that such letters are ineffective. Defendants do not have a special method, or any method (legal or otherwise), to "cancel" timeshare contracts.

8.      TDA leads prospective customers to believe that, if hired, TDA can effectuate a cancellation of the customer's timeshare. TDA knows that it cannot do so.  TDA knows that the only way a customer's timeshare will be cancelled is if the customer stops making required payments to Capital.  Despite that knowledge, TDA leads customers to believe that it can and will effectuate a cancellation of the timeshare without any negative consequences.

9.      Once customers hire TDA, individuals like Fonbuena and Douglas G. Walker, an attorney with TDA, send boilerplate written correspondence to timeshare companies, including Capital, demanding contract cancellation, and that customers be restored to the same financial position they would have been in had they not purchased the timeshare interest. These boilerplate letters offer deeds in lieu of foreclosure or voluntary surrender of the customer's timeshare interest.

10.     These letters do not actually bring about cancellation of a timeshare.  Instead, these letters are intended to and have the effect of misleading TDA's customers to believe that a lawyer has reached a meaningful conclusion that the customers were defrauded or subjected to

misrepresentation when purchasing the timeshare, and that TDA will be effectuating a cancellation of the timeshare. Whether the content of these letters is true or not is immaterial.

11.    Defendants engage in an elaborate misdirection scheme designed to convince the customer that its communications will bring about cancellation of the timeshare, knowing that is not true and that Defendants could not and are not actually providing any such service. Defendants use this ruse to lead timeshare owners to falsely believe that they are generating leverage that will allow them to negotiate a surrender of their timeshare, even though Defendants know that they are not providing the service, that these efforts will be unsuccessful, and that the customer will only ever have his timeshare cancelled by defaulting on payment obligations to Capital.

12.    Defendants use the foregoing, and a slew of other deceptive and unfair trade practices, all of which harm customers and Capital, to enrich themselves.

13.    Defendants use this scheme to lead customers to falsely believe that they are justified in stopping payments to Capital. Ultimately, the customers are harmed by paying substantial fees to TDA for a supposed service that TDA cannot provide, which will not be effective, which is really only payment default, and which will only result in negative credit reporting, or other adverse consequences to the customers. Defendants use this scheme to induce the customers to stop payments to timeshare companies, including Capital, under false pretenses. Defendants do this to unlawfully enrich themselves.

14.    Defendants also use this scheme to harm timeshare companies, including Capital, by diverting payments the customers would otherwise make to timeshare companies to Defendants instead. Defendants do this to unlawfully enrich themselves.

15.    This scheme is also indiscriminate. Defendants have contrived a process to convince customers that they have a grievance against the timeshare company, including Capital.

Regardless of whether the customer has such a grievance, or the legitimacy of same, this is part of the marketing and sales process, leading the customer to believe that they have a grievance, and that Defendants can or will do something about that grievance to bring about cancellation of the timeshare.

16.     Defendants' use of deceptive and unfair trade practices plays a material and substantial part in Defendants inducing Capital's customers to breach existing contracts with Capital, default on payment obligations to Capital, and cease doing business with Capital.

17.     Defendants are aware that it is not in the interest of Capital owners to default on their payment obligations; however, they nonetheless induce such non-payment as the means of delivering the advertised exit, cancellation, or termination.

18.     As a result of this scheme, Capital has suffered and continues to suffer significant monetary and other losses.

## **PARTIES**

19.     Plaintiff Capital Resorts Group, LLC d/b/a Capital Vacations, a Delaware limited liability company, is a company with its principal place of business located in Myrtle Beach, South Carolina. Its sole member is Capital Vacations, LLC, a Delaware limited liability company with its principal place of business located in Myrtle Beach, South Carolina. Capital Vacations, LLC's members consist of limited liability companies, a profit-sharing plan, and an investment account. The members of the limited liability companies, profit-sharing plan, and investment account are all individuals or a family trust, with one exception where a limited liability company is the member and a family trust is the member of that limited liability company. All of the individual members of these sub-members of Capital Vacations reside and are domiciled in South Carolina, Florida, Missouri, California, and Massachusetts. The two family trusts have trustees that reside

and are domiciled in South Carolina. CAPITAL RESORTS GROUP, LLC is therefore a citizen of South Carolina, Florida, Missouri, California, and Massachusetts.

20.     Defendant Fonbuena Law Firm, CHTD, d/b/a Timeshare Defense Attorneys, is a Nevada limited liability company organized and existing under the laws of Nevada, with its principal place of business located at 3320 N. Buffalo Dr., STE 208, Las Vegas, NV, 89129, USA. Fonbuena is the sole member of TDA.

21.     Defendant Fonbuena is an individual and resident of the State of Nevada.

### JURISDICTION & VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are completely diverse, and the relief sought satisfies the amount in controversy requirement.

23.     Complete diversity exists because Plaintiff is a citizen of only South Carolina, Florida, Missouri, California, and Massachusetts, and Defendants are citizens of only of Nevada.

24.     The amount in controversy greatly exceeds $75,000.  This includes money damages in excess of $75,000, as well as injunctive relief that would prohibit Defendants from engaging in conduct that results in collecting fees well in excess of $75,000. The value of such injunctive relief to Capital also exceeds $75,000 because it would prevent Capital timeshare owners from becoming TDA customers and prevent Defendants from unlawfully inducing those customers to default on payment obligations to Capital. The value of this relief to Defendants also greatly exceeds $75,000 because it would prevent Defendants from collecting or retaining all or part of the fees charged to customers.

25.     This Court has personal jurisdiction over Defendants because this action arises out of and is related to the Defendants' purposeful contacts with the State of South Carolina, including:

(1) utilizing unfair and deceptive trade practices that injure Capital, a South Carolina company; (2) directing unfair and deceptive trade practices into South Carolina and towards Capital owners that are South Carolina residents; (3) intentionally interfering with contracts between Capital, whose principal place of business is located in South Carolina, and Capital timeshare owners that are South Carolina residents; (4) intentionally interfering with contractual relationships between Capital and non-South Carolina residents, both of which causes foreseeable harm to Capital in the state of South Carolina; (5) causing damage to Capital, whose corporate offices are located in South Carolina and where the Capital owners' defaults are felt as such monies are due here, in this state and in this jurisdiction; (6) causing false demand letters to be directed to Capital in South Carolina, and (7) executing agreements to provide services to Capital timeshare owners, some of whom are South Carolina residents.

26.    Fonbuena is further subject to the personal jurisdiction of the State of South Carolina in that he is the architect, controller, director, and ultimate decision-maker with regard to TDA's participation the advertisements that are conducted in all states, including South Carolina. Fonbuena, for the benefit of TDA, also directs mail and email to Capital and Capital owners located in South Carolina.

27.    Venue is proper in the District of South Carolina pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district, or, alternatively, pursuant to 28 U.S.C. § 1391(b)(3) because there is no other district in which this action could be brought, and Defendants are subject to personal jurisdiction in this district.

## GENERAL ALLEGATIONS

**A.    The Capital Timeshare Purchase**

28.    Capital has valid and enforceable timeshare contracts with numerous customers, dating back many years, and both Capital and its customers who become TDA customers are performing on those timeshare contracts.

29.    At the time of a Capital timeshare purchase, each purchaser executes a written Purchase & Security Agreement ("Purchase Agreement") with Capital, pursuant to which the customer acquires Membership in the Capital Vacations Club multi-timeshare plan.  That Membership includes certain Member Rights and an allocation of Capital Points, which are exchanged for the right to use and occupy vacation properties. Membership also includes an annual obligation for Capital Participation Fees, commonly referred to as maintenance fees, and which include any common assessments, club dues, and facilities fees, to cover property taxes, insurance, and similar expenses associated with operating the vacation properties.

30.    If a purchaser desires to finance the Capital purchase, he or she may apply for and receive purchase money financing from Capital, and execute a Promissory Note, typically requiring monthly payments to Capital over a 10-year term.  Most Capital customers finance their purchases.

31.    The customer relationships Capital creates are of the utmost importance to Capital and are vital to Capital's success.  Capital devotes substantial attention and resources to developing and preserving its customer relationships.

32.    The Purchase Agreements and the Promissory Notes, and Capital's customer's compliance with those contractual obligations—including timely and complete payments to Capital—are also of utmost importance to Capital's business.

33.     Contrary to Defendants' promises to cancel customers' timeshares, Defendants cannot and do not actually deliver any such service.  Any customer's grievance, instigated and promoted by Defendants, is wholly immaterial because Defendants cannot and do not actually do anything with any such grievance that could or does bring about cancellation of a timeshare. Nonetheless, Defendants are intent on disrupting and destroying Capital's relationships with its customers, and Capital's customer's timely and complete payment of their financial obligations to Capital.

**B.    Defendants' Scheme**

34.     Defendants engaged in a timeshare cancellation scheme with no legitimate foundation, which is designed solely to induce existing timeshare owners, including Capital customers, to breach their Purchase Agreements and Promissory Notes with Capital, and to instead enrich Defendants by collecting payments from the customers that the customers would otherwise pay to Capital.

35.     The scheme begins with outward facing marketing and advertising, which can easily be viewed at https://timesharedefenseattorneys.com.  TDA's website could not be more obvious in that it is offering to assist consumers to bring about cancellation of a timeshare.

36.     TDA's website states and suggests that TDA provides legal counsel to get out of timeshare contracts, claiming that a timeshare contract may be difficult to cancel, but not impossible, and that TDA can get the job done.

37.     On information and belief, TDA also uses numerous other marketing and advertising channels to promote and sell its supposed "services."  Regardless of such channels and the marketing and advertising content TDA uses, it is all premised on the false idea that TDA can and will do something to bring about cancellation of a timeshare.  Given the marketing and

advertising content, consumers know going into any sales discussion with TDA that they need to have a grievance against the timeshare company, and it's no surprise that TDA's contrived process can convince consumers that they have a grievance where none exists, and that TDA can bring about cancellation of the timeshare.

38.     TDA's marketing and advertising is false as TDA does not engage in any process that can result in a timeshare exit. Instead, TDA relies on purchasers to default under the Purchase Agreements and Promissory Notes and subsequent termination of the timeshare contract caused by the Capital owner's default that TDA induced in the first place.

39.     On information and belief, TDA has sales meetings or consultations with prospective customers.  At these meetings or consultations, TDA tells the customers whatever they need to say to convince the customers that they have a grievance and TDA can and will bring about cancellation of the timeshare.

40.     TDA does not engage in any specific tailoring of solutions for timeshare owners, including Capital owners, as evidenced by the boilerplate language that TDA uses in its demand letters. TDA knows that there are no factual or legal grounds to terminate or otherwise breach the owners' contractual relationship with Capital. Instead, TDA relies generically on each Capital owner to stop payments under the Purchase Agreements and Promissory Notes to accomplish the advertised exit.

41.     The fact that default is the "process" and the sole means by which TDA achieves its service is never disclosed to the potential customer in TDA's advertising and marketing.

42.     TDA's purported "service" is illusory because the TDA does nothing more than simply send Capital form demand letters. But TDA knows that these demand letters are ineffective and that Capital does not acquiesce to the demands and requests made in these letters. The demand

letters are designed to do nothing more than give the appearance of a legal process to the unwitting Capital owners responding to TDA's advertising and marketing.

43.    TDA's demand letters instruct Capital not to contact TDA's clients, thus serving to forbid Capital from communicating with Capital owners in order to further TDA's deliberate interference with Capital owners and Capital's contractual and business relationships for TDA's pecuniary benefit.

44.    Because Capital owners are purportedly represented by counsel and Capital is forbidden from communicating with them, Capital owners are completely unaware—often until they suffer adverse consequences, including deterioration of credit score, loss of principal payments made, and loss of enjoyment—that TDA is accomplishing absolutely nothing for them except for interference with their legitimate and legally binding Capital Purchase Agreements and Promissory Notes.

45.    Whether Capital engages in any of the conduct allegedly giving rise to the customer's purported grievance is entirely irrelevant to TDA or to any issue in this case because TDA cannot and does not do anything to challenge the fact that Capital's contracts are valid and enforceable. Instead, TDA spends its efforts to intentionally mislead timeshare owners to believe TDA has a strategy and is doing work that will bring about cancellation of the timeshare, so that it appears TDA is earning the fees charged, and so that the customer will persist in non-payment to Capital long enough to trigger Capital's recovery process.  Such conduct is not in TDA clients' best interest and is instead motivated by personal ambitions and ulterior purposes.

46.    Despite its advertisements and sales practices, including promises and offers of legal cancellation of the timeshare, and other promises and offers relating to debt management or

debt relief, TDA does not actually have any cognizable method to deliver on its express and implied promises.

47.     Until the timeshare owners' payment default reaches a point where Capital initiates recovery efforts, TDA sends communications to Capital.  TDA does this to give the impression to the customer that TDA is doing something.  However, TDA is merely waiting for payment default to run its course, and creating an illusion of work performed so that TDA can later use that as a basis to claim success when the timeshare owner eventually has his or her timeshare cancelled due to payment default through Capital's recovery process.

48.     TDA's scheme is designed to be executed through deceptive advertising followed by false promises, deceptive communications, and false assurances that timeshare owners no longer owe any obligations to timeshare companies, including Capital.

49.     Fonbuena is individually liable for the conduct described herein.

50.     Fonbuena actively, knowingly, and individually directs and ratifies TDA's false and misleading acts, as well as the false, misleading, and deceptive statements made to Capital owners by TDA. Moreover, pursuant to the applicable rules of professional conduct governing Fonbuena's license to practice law, Fonbuena is personally responsible for knowing of and exercising control over TDA's advertising, either conducted on its own or through third parties, and that he knows generates referral for TDA. *See* Nevada Rules of Professional Conduct 7.1 & 7.2.

**C.    <u>Defendants' Actions Have Harmed And Damaged Capital</u>**

51.     To date, TDA's false advertising and deceptive and unfair trade practices, all as described above, have caused Capital owners to retain TDA and, at TDA's express or implied

instruction, to stop making payments due to Capital, which harms Capital.  The amounts that the customers owed to Capital, but did not pay, form part of the basis for Capital's damages claims.

52.    To date, TDA's false advertising and deceptive and unfair trade practices, all as described above have also caused Capital owners to end their customer relationships with Capital, which harms Capital.

53.    To date, TDA's false advertising and deceptive and unfair trade practices, all as described above, have also caused Capital to have to devote attention and resources to addressing the letters TDA sends to Capital to the detriment of addressing other Capital customers' needs. TDA sent the letters knowing that the letters would not effectuate a cancellation of the timeshare.

54.    Moreover, Defendants' actions present an immediate threat of irreparable harm to Capital, and Capital has and will suffer irreparable harm if Defendants, and their agents, affiliated companies or entities, representative, and employees are not enjoined from this conduct.

55.    The threat of irreparable harm is continuing because Defendants currently engage in ongoing business whereby TDA solicits Capital owners using the deceptive and unfair practices outlined above and then convinces Capital owners to stop their payment obligations associated with their Capital timeshare interest. The future defaults that will ensue because of Defendants' ongoing conduct will result in future direct economic loss to Capital.

56.    As a result of the Defendants' actions, Capital will proximately and imminently have thousands of dollars in delinquent obligations from TDA's customers and will be forced to expend monies foreclosing or taking other actions on the delinquent timeshare interest.

57.    Capital has no adequate remedy at law, as damages will not fully address the harm Capital will suffer if Defendants are permitted to continue with this activity.

58.     The injury and potential harm caused by Defendants' false advertising and deceptive and unfair practices outweigh the harm, if any, that an injunction would cause to Defendants.

59.     The issuance of the requested injunction, as described below, will serve the public interest by protecting Capital's legitimate business interests and, by implication, the interests of Capital timeshare owners, by restraining the unlawful, disruptive actions being committed by Defendants.

60.     All conditions precedent to the filing of this action have been satisfied, waived, or have occurred.

61.     Capital has retained the law firms of Greenspoon Marder LLP and Turner Padget Graham and Laney, P.A. to represent it in this action and is obligated to pay reasonable attorneys' fees and costs incurred herein.

## COUNT I
## VIOLATION OF SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE §39-5-10, *et seq.*

62.     Capital realleges and reincorporates the allegations contained in paragraphs 1 through 61 above as if set forth fully herein.

63.     This is a cause of action for violations of the South Carolina Unfair Trade Practices Act, S.C. Code § 39-5-10, *et seq.* ("SCUTPA"), against Defendants, including unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

64.     TDA, Fonbuena, and Capital are all "persons" as defined by S.C. Code § 39-5-10(a).

65.     TDA, Fonbuena, and Capital are all engaged in "trade" and "commerce" as defined by S.C. Code § 39-5-10(b).

14

66.    Defendants have engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

67.    TDA purposefully inserts itself into the same marketplace in which Capital operates—the timeshare industry consisting of existing timeshare owners. TDA's false advertising is directed to Capital's existing customers.

68.    TDA advertises to Capital's existing customer base to persuade them to engage TDA, to dishonor their existing contracts with Capital, and to divert payments from Capital to TDA.

69.    TDA has engaged in unfair competition and unfair and deceptive acts or practices as set forth above by:

    a)    engaging in false and misleading advertisements, including as set forth above;

    b)    falsely leading customers to believe that any claimed wrongful conduct by the timeshare seller in connection with the timeshare purchase is what justifies stopping payments for the timeshare;

    c)    falsely leading customers to believe that any claimed wrongful conduct by the timeshare seller in connection with the timeshare purchase is what will cause or bring about cancellation of the timeshare;

    d)    falsely leading customers to believe that Defendants have relevant expertise and experience in bringing about cancellation of a timeshare;

    e)    instructing or suggesting to customers that they stop making payments for the timeshare under false pretenses;

f) stating or implying to customers that, as a result of not making payments for the timeshare, there is no penalty or other consequence, that any penalty or consequence will be short lived, or that TDA will repair or ameliorate any penalty or consequence;

g) attempting to procure a cancellation of a timeshare based on payment default, foreclosure, inaction, or the passage of time;

h) promising or providing illusory credit repair and credit improvement services without complying with and violating existing state and federal laws;

i) promising or providing illusory debt management or debt relief related services without complying with and violating existing state and federal laws;

j) engaging in knowingly unlawful, fraudulent, false, and deceptive practices.

70. This enumeration is not intended to be exhaustive and additional false and misleading statements and deceptive acts and practices that Capital will include in this claim and for which Capital will seek relief herein are expected to be identified by continuing investigation and through discovery.

71. At all times relevant herein, Fonbuena managed and controlled TDA's operations, and therefore directed TDA's operations that Capital alleges to have been unfair or deceptive acts or practices, including but not limited to leading customers to believe that TDA is doing something on the customer's behalf. Fonbuena is personally liable for all actions he took on TDA's behalf.

72. Defendants knew or should have known that the above conduct was unfair competition and constitutes unfair and deceptive acts or practices.

73. Defendants intended that the above conduct would induce another to rely on and act on that conduct, specifically, Capital timeshare owners.

74.     Defendants' conduct offends established public policy, is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers and businesses alike.

75.     Defendants' conduct constitutes unfair commercial practices, deception, fraud, false pretenses, misrepresentation and the known concealment and misrepresentation of material facts, all in violation of SCUTPA.

76.     As a direct and proximate result of Defendants' unfair competition and unfair and deceptive conduct outlined above, Capital timeshare owners have been harmed and Capital has been harmed and damaged.   More specifically, the harm Defendants have caused to Capital timeshare owners includes charging substantial fees to provide a supposed service that Defendants cannot provide, that does not really exist, and that is ineffectual, since the timeshare cancellation will only occur, if ever, based on payment default, which is a result that timeshare owners could obtain for free by themselves, without paying TDA.   This harm to Capital timeshare owners in turn damages Capital

77.     This harm to Capital timeshare owners in turn proximately causes damages to Capital. The harm Defendants have caused to Capital includes but is not limited to: (1) losing the ability to communicate with its own customers; (2) losing a customer relationship; (3) losing the payment streams that Capital was entitled to receive from the customer; (4) incurring costs associated with collections and recovery of defaulted timeshare interests; (5) incurring carrying costs for recovered timeshare interests prior to being able to re-sell those interests; and (6) incurring marketing and sales costs associated with re-selling recovered timeshare interests if it is able to re-sell those interests.

78. Capital has a clear legal right or interest in being free from Defendants' unfair competition and unfair and deceptive conduct above that has harmed Capital and will result in future harm to Capital if Defendants are not enjoined.

79. Defendants are continuing to engage in the false, unfair, and deceptive conduct described above, and there is therefore a strong likelihood that Capital will suffer irreparable harm on an ongoing basis, and any remedy at law for Defendants' perpetuation of the false, deceptive, and unfair conduct is inadequate.

80. An injunction serves the public purpose.

81. By this action, Capital seeks the following specific relief:

    a) Declaring Defendants' conduct to be unfair competition and unfair and deceptive conduct in violation of South Carolina law;

    b) Enjoining Defendants and those persons in active concert or participation with them from:

        (i) engaging in false and misleading advertisements, including as set forth above;

        (ii) leading customers to believe that any claimed wrongful conduct by the timeshare seller in connection with the timeshare purchase is what justifies stopping payments for the timeshare;

        (iii) leading customers to believe that any claimed wrongful conduct by the timeshare seller in connection with the timeshare purchase is what will cause or bring about cancellation of the timeshare;

        (iv) leading customers to believe that Defendants have relevant expertise and experience in bringing about cancellation of a timeshare;

(v)     instructing or suggesting to customers that they stop making payments for the timeshare;

(vi)    stating or implying to customers that, as a result of not making payments for the timeshare, there is no penalty or other consequence, that any penalty or consequence will be short lived, or that TDA will repair or ameliorate any penalty or consequence;

(vii)   attempting to procure a cancellation of a timeshare based on payment default, inaction, or the passage of time;

(viii)  promising or providing illusory credit repair and credit improvement services without complying with and violating existing state and federal laws;

(ix)    promising or providing illusory debt management or debt relief related services without complying with and violating existing state and federal laws;

c)      Requiring TDA to cease broadcasting, take down, and destroy all false, misleading, and deceptive materials;

d)      Directing TDA to file with this Court and serve on Capital within fifteen days after the injunction, a report, in writing and under oath, setting forth in detail the manner and form in which TDA has complied with the injunction;

e)      Requiring TDA to provide notice of such injunction by posting the Order on the websites used by TDA and any websites which refer to and/or link to the websites used by TDA;

f)   A Judgment in favor of Capital and against Defendants for statutorily allowed monetary damages pursuant to S.C. Code § 39-5-140(a);

g)   A Judgment in favor of Capital and against Defendants for treble its actual damages (*see* S.C. Code § 39-5-140(a)); and

h)   A Judgment in favor of Capital and against Defendants for attorneys' fees and costs pursuant to S.C. Code § 39-5-140(a).

**WHEREFORE**, Capital respectfully demands judgment in its favor and against Defendants, and requests temporary and permanent injunctive relief, damages, attorneys' fees and costs, and such additional and further relief as this Court deems just and proper.

## COUNT II
### VIOLATION OF NORTH CAROLINA TIMESHARE ACT,
### N.C. Gen. Stat. § 93A-39, *et seq.*

82.   Capital realleges and reincorporates the allegations contained in paragraphs 1 through 61 above as if set forth fully herein.

83.   Capital markets, sells, and/or manages 14 resorts in North Carolina. All but three of Capital's North Carolina resorts are components of Capital's multi-site vacation club, such that when a Capital Club member defaults or cancels, the Club and all of the component resorts, including those in North Carolina, are harmed.

84.   Capital has had members residing in North Carolina that have worked with and been victimized by TDA through the unfair and deceptive conduct described throughout this Complaint, which has in turn caused harm to Capital as described herein.

85.   The North Carolina Timeshare Act, N.C. Gen. Stat. § 93A-39, *et seq.*, among other things, regulates the activities of timeshare exit companies, including TDA.

86.   TDA is a "transfer service provider," as defined by N.C. Gen. Stat. § 93A-41(49).

87.    TDA enters into "timeshare transfer services agreements" with customers, as defined by N.C. Gen. Stat. § 93A-41(46).

88.    TDA performs "timeshare transfer services," as defined by N.C. Gen. Stat. § 93A-41(45).

89.    TDA is a "regulated parties," as defined by N.C. Gen. Stat. § 93A-41(26).

90.    TDA's customers are "consumer timeshare resellers," as defined by N.C. Gen. Stat. § 93A-41(8).

91.    TDA's customers own "consumer resale timeshares," as defined by N.C. Gen. Stat. § 93A-41(7).

92.    TDA is a "person," as defined by N.C. Gen. Stat. § 93A-41(22).

93.    Capital is a "developer," as defined by N.C. Gen Stat. § 93A-41(9).

94.    Capital is a "managing entity," as defined by N.C. Gen Stat. § 93A-41(18).

95.    At all times relevant herein, Fonbuena managed and controlled TDA's operations, and therefore directed TDA's operations that Capital alleges to have violated the North Carolina Timeshare Act, including but not limited to leading customers to believe that TDA is doing something on the customer's behalf.  Fonbuena is personally liable for all actions he took on TDA's behalf.

96.    North Carolina Gen. Stat. § 93A-68(a) prohibits certain conduct in the course of advertising, marketing, promoting, offering, sale, or performance of any timeshare transfer services.

97.    TDA violates N.C. Gen. Stat. § 93A-68(a), as detailed in the above factual recitation, which is incorporated by reference and includes but is not limited to:

a)    Advising, suggesting, or assisting with advising or suggesting that a

consumer timeshare reseller (like Capital timeshare owners) cease making any payment of assessments, ad valorem real estate taxes, or any other sums imposed against the consumer resale timeshare (maintenance fees owed to Capital), or any payment of any amounts due to a mortgagee or other lienor under a mortgage or other lien or encumbrance secured by the consumer resale timeshare (payments to Capital for financed timeshare purchase);

b)     Representing, expressly or by implication, that (i) a consumer timeshare reseller cannot or should not contact or communicate with the developer, managing entity, exchange company, mortgagee, or lienor or (ii) the developer, managing entity, exchange company, mortgagee, or lienor is prohibited from contacting or communicating with the consumer timeshare reseller; and

c)     Charging or accepting a fee for obtaining, negotiating, arranging, or assisting with obtaining, negotiating, or arranging the voluntary relinquishment of a consumer resale timeshare to a managing entity in lieu of payment of assessments or *ad valorem* real estate taxes.

98.     North Carolina Gen. Stat. § 93A-68(c) provides certain provisions that must be in all timeshare transfer services agreements.

99.     TDA violates N.C. Gen. Stat. § 93A-68(c), by failing to include the following provisions in its timeshare transfer services agreements:

a)     A statement that no fee, cost, or other compensation may be received by or paid to TDA before the delivery to the customer of written proof of completed services, including: (i) delivery of the recorded timeshare

instrument or other legal document evidencing the transfer of ownership of or legal title to the timeshare; and (ii) delivery of the legal document evidencing the mutually agreed upon termination of the timeshare instrument or timeshare loan obligation.

b)      The name, address, current phone number, and current email address of the independent escrow agent required by the North Carolina Timeshare Act;

c)      A specific, detailed description of each service to be provided, the last date by which it will be fully performed, and a statement that the service provider will deliver to the customer written notice of the full performance of each service, together with a copy of the legal document evidencing the completed service;

d)      The total cost to the customer of each service to be provided, together with an itemized list of all of the fees and costs that comprise the total cost of that service;

e)      The terms or conditions of any refund, cancellation, exchange, or repurchase policy for each service, including the circumstances under which a guaranteed or nonguaranteed, full or partial refund will be granted;

f)      A statement in conspicuous type that nonpayment of a timeshare loan obligation or assessment obligation may lead to a foreclosure action or other proceeding that could result in the loss of ownership of the timeshare and negative consequences for the consumer timeshare reseller's credit and tax liability; and

g)      Conspicuous statutorily required disclosures largely summarizing the

foregoing, the customer's right to rescind the agreement for services, and the customer's right to a refund;

100.    North Carolina Gen. Stat. § 93A-68(d) provides that if the services to be provided include relief to be obtained from the timeshare managing entity, mortgagee, or lienor, the timeshare transfer service provider may not:

    a)    Request or receive payment of any fee or other consideration until the customer has executed a written agreement with the timeshare managing entity, mortgagee, or lienor incorporating the offer of relief the service provider obtained from the timeshare managing entity, mortgagee, or lienor; and

    b)    Fail to provide conspicuous statutorily required disclosures relating to the customer's right to accept or reject offers from the timeshare managing entity, mortgagee, or lienor.

101.    TDA violates N.C. Gen. Stat. § 93A-68(d) by being in violation of the advance fee ban and failing to provide conspicuous statutorily required disclosures.

102.    On information and belief, TDA violates N.C. Gen. Stat. § 93A-68(f) by failing to deposit in an escrow account all funds that are received from or on behalf of a customer and/or failing to hold the fee, cost, or other compensation that is due or that will be paid in an escrow account until they have fully complied with all of their contractual obligations and the North Carolina Timeshare Act.

103.    On information and belief, TDA violates N.C. Gen. Stat. § 93A-68(h) by failing to have an independent escrow agent retain all service agreements, escrow account records, and affidavits received pursuant to the North Carolina Timeshare Act for a period of five years.

104.    On information and belief, TDA violates N.C. Gen. Stat. § 93A-68(i) by intentionally failing to comply with the provisions of N.C. Gen. Stat. § 93A-68 concerning the establishment of an escrow account, deposits of funds into escrow, withdrawal therefrom, and maintenance of records.

105.    TDA's unlawful conduct induced Capital owners to stop making payments to Capital.

106.    As a direct and proximate result of TDA's conduct outlined above, Capital owners have been harmed and Capital has been damaged. Specifically, the harm to Capital includes, but is not limited to: (1) losing the ability to communicate with its own customers; (2) losing a customer relationship; (3) losing the payment streams that Capital was entitled to receive from the customer; (4) incurring costs associated with collections and recovery of defaulted timeshare interests; (5) incurring carrying costs for recovered timeshare interests prior to being able to re-sell those interests; and (6) incurring marketing and sales costs associated with re-selling recovered timeshare interests if it is able to re-sell those interests.

107.    Capital has a clear legal right or interest in being free from Defendants' conduct that violates the North Carolina Timeshare Act that has harmed Capital and will result in future harm to Capital if not enjoined.

108.    Defendants are continuing to engage in the unlawful conduct described above, and there is therefore a strong likelihood that Capital will suffer irreparable harm on an ongoing basis, and any remedy at law for Defendants' perpetuation of the illegal conduct is inadequate.

109.    Pursuant to N.C. Gen. Stat. § 93A-68(o), Capital is entitled to seek and obtain injunctive relief and an award of attorney's fees for violations of N.C. Gen. Stat. § 93A-68.

110.    An injunction serves the public purpose.

111.    By this action, which incorporates the above allegations, Capital seeks the following relief, including, but not limited to:

a)    Declaring Defendants' to be unlawful in violation of North Carolina law

b)    Enjoining Defendants and those persons in active concert or participation with them from:

(i)    Advising, suggesting, or assisting with advising or suggesting that a timeshare owner cease making any payment of assessments, ad valorem real estate taxes, or any other sums imposed against the timeshare owner, or any payment of any amounts due to a mortgagee or other lienor under a mortgage or other lien or encumbrance secured by the timeshare;

(ii)    Representing, expressly or by implication, that (i) a timeshare owner cannot or should not contact or communicate with the developer, managing entity, exchange company, mortgagee, or lienor or (ii) the developer, managing entity, exchange company, mortgagee, or lienor is prohibited from contacting or communicating with the timeshare owner;

(iii)    Charging or accepting a fee for obtaining, negotiating, arranging, or assisting with obtaining, negotiating, or arranging the voluntary relinquishment of a timeshare to a managing entity in lieu of payment of assessments or ad valorem real estate taxes;

(iv)    Entering into services agreements that do not include disclosures and statements required by the North Carolina Timeshare Act;

(v)    Failing to provide disclosures and statements to customers as required by the North Carolina Timeshare Act;

(vi)   Violating the advance-fee ban contained in the North Carolina Timeshare Act;

(vii)  Failing to deposit in an escrow account all funds that are received from or on behalf of a consumer timeshare reseller under a services agreement and/or failing to hold the fee, cost, or other compensation in an escrow account until has fully complying with all of the obligations under the services agreement and the North Carolina Timeshare Act;

(viii) Failing to use an independent escrow agent that retains all services agreements, escrow account records, and affidavits received pursuant to the North Carolina Timeshare Act for a period of five years;

c)    A Judgment in favor of Capital and against Defendants for attorneys' fees and costs pursuant to N.C. Gen. Stat § 93A-68(o).

d)    Any such other relief as the court considers necessary and proper.

**WHEREFORE**, Capital respectfully demands judgment in its favor and against Defendants, and requests permanent injunctive relief, attorneys' fees and costs, and such additional and further relief as this Court deems just and proper.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT AND ADVANTAGEOUS BUSINESS RELATIONSHIPS

112.    Capital realleges and reincorporates the allegations contained in paragraphs 1 through 61 above as if set forth fully herein.

113.    Capital has valid and legally enforceable contracts with Capital owners relating to the Capital owners' timeshare interests.

114.    As outlined above, Defendants have knowledge of those relationships. The very fact that Capital has business and contractual relationships with Capital owners is the basis under which Defendants seek to establish their own relationships with the Capital owners through TDA.

115.    Defendants capitalize on Capital's contractual relationships with the Capital owners by working through TDA and its marketing and advertising partners to (1) solicit the Capital Owners through false and misleading advertising; (2) fraudulently inducing the Capital owners to pay large upfront fees to Defendants instead of making their legally due and owing payments to Capital; and (3) fraudulently inducing Capital owners to altogether stop making payments to Plaintiffs in contravention of the legally enforceable contracts between the Capital owners and Capital.

116.    This is effectuated by TDA disseminating false and misleading advertising to consumers, such as Capital owners, luring them to do business with TDA through advertised statements about TDA's alleged past success and promises of future results.

117.    After TDA lures Capital owners to do business with TDA, TDA induces Capital owners into paying large upfront fees for the purposes of retaining TDA to provide its illusory services.

118.    After being retained, TDA leads Capital owners to believe that they can cease their mortgage, maintenance, and/or tax payments that are due and owing to Capital. This is effectuated by TDA sending one-size-fits-all letters of representation to Capital – drafted without any

meaningful analysis into the actual facts and circumstances unique to each Capital owner's situation – informing Capital of TDA's purported representation of the Capital owner.

119.    Fonbuena personally and individually concocted the scheme described above, and personally and individually implemented and directed implementation of the scheme described above, in fact signing some of the letters of representation himself.

120.    Defendants' willful actions to induce parties with whom Capital has valid contractual agreements to breach their agreements constitute intentional interference with existing contracts.

121.    Defendants have intentionally and without justification or privilege interfered with Capital's existing contracts and business relationships by inducing Capital owners to stop making payments under their contracts without any legal basis.

122.    Defendants' actions were not made in good faith, but were made for purely selfish and mercenary reasons so as to earn and retain the large pre-paid retainer fee without actually providing any meaningful services to the Capital owners and were made with the knowledge and purpose to injure Capital or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from Defendants' actions and without reasonable grounds for Defendants to believe that their actions were justified and proper.

123.    As a direct and proximate result of Defendants' intentional misconduct, Capital owners have breached, terminated, or have sought to terminate, their contractual relationships with Capital before the expiration of the terms of those contracts.

124.    As a direct and proximate result of the foregoing, Capital suffered damages and, if Defendants' conduct is not enjoined, will continue to suffer injury for which relief at law is inadequate.

**WHEREFORE**, Capital respectfully demands judgment in its favor and against Defendants, and requests permanent injunctive relief, compensatory damages, special damages, punitive damages, interest, and attorneys' fees and costs, and such additional and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

Plaintiff respectfully requests the Court enter final judgment in its favor against Defendants, jointly and severally, for:

A.  Actual damages;

B.  Compensatory damages;

C.  Statutory damages under SCUTPA and the North Carolina Timeshare Act;

D.  Punitive damages where such damages are permitted;

E.  An award of court costs;

F.  An award of attorney's fees under SCUTPA and the North Carolina Timeshare Act;

G.  Together with pre- and post-judgment interest thereon;

H.  Entry of a permanent injunctive against Defendants, as well as their respective agents, representatives, employees, and affiliates, as well as those action in participation with or in active concert with them, as to all Counts and, amongst other matters, prohibiting Defendants from engaging in those acts as set forth above; and

I.  For such other and further relief as the Court deems necessary and appropriate.

## JURY TRIAL DEMAND

Capital hereby demands a jury trial on all issues so triable.

DATED this 8th day of July, 2024.

Respectfully submitted,

s/John S. Wilkerson, III
John S. Wilkerson, III, (Fed. ID No. 4657)
P.O. Box 22129
Charleston, SC 29413
Telephone: 843-576-2801
Email: jwilkerson@turnerpadget.com

Richard W. Epstein
Florida Bar No. 229091
*Pro hac vice motion forthcoming*
Jeffrey Backman
Florida Bar No. 662501
*Pro hac vice motion forthcoming*
Greenspoon Marder LLP
200 E. Broward Blvd., Suite 1800
Fort Lauderdale, FL 33301
Telephone: (954) 491-1120
Facsimile: (954) 343-6958
richard.epstein@gmlaw.com
jeffrey.backman@gmlaw.com
ron.charlot@gmlaw.com

*Counsel for Plaintiff*